**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____
                                       :
**LOUISIANA MUNICIPAL POLICE**          :
**EMPLOYEES RETIREMENT SYSTEM,**        :
**individually and on behalf of all others**   :          Civil Action No. 03-CV-4372 (DMC)
**similarly situated,**                  :
                                       :
              **Plaintiffs,**            :
                                       :
        **-vs-**                         :
                                       :
**SEALED AIR CORPORATION and**          :                      **OPINION**
**TJ DERMOT DUNPHY,**                   :
                                       :
              **Defendants.**            :
_____:

**FALK, U.S.M.J.**

Before the Court is Plaintiff Louisiana Municipal Police Employees' Retirement System's

("Plaintiff" or "MPERS") motion to compel the production of documents. Defendants Sealed Air

Corporation and T.J. Dermot Dunphy (collectively, "Defendants" or "Sealed Air") have opposed the

motion. The motion is decided on the papers submitted. Fed. R. Civ. P. 78(b); L.Civ.R. 37.1(b)(4).

For the reasons that follow, Plaintiff's motion is **granted in part and denied in part**.

**BACKGROUND**

This is a class action for alleged violations of the Securities Exchange Act of 1934. The

background of this case has been set forth in detail by District Judge Cavanaugh in prior opinions

and is repeated verbatim here:

> W.R. Grace & Co. ("Grace") and Sealed Air Corporation
> ("Sealed Air") were involved in a corporate transaction in
> 1998 which lead to the subject claim. Grace was made up of
> several divisions of business, one of which was the Grace

packaging division, which manufactured packaging products and specialized in packaging perishable foods. Sealed Air is a holding company that, through its subsidiaries, manufactures and sells a wide range of food and protective packaging products.

Before 1998, Grace faced growing asbestos liability problems. Grace's asbestos liability problems stemmed from its former asbestos-containing insulation business. Additionally, Grace accumulated liabilities from its 1963 acquisition of Zonolite Co. by assuming all of Zonolite's liabilities. Grace was involved with asbestos litigation for decades.

By the late 1970's, Grace was considering divestment of asbestos-related businesses in order to shelter the company's non-asbestos business areas. In a 1996 transaction, Grace spun off its medical care business to isolate those assets from asbestos liability. In a 1998 transaction, Grace spun off its packaging division of the company and absorbed Sealed Air packaging, in an effort to further insulate its non-asbestos businesses from the threat of liability. Thus, the corporate defendant in this action, currently bearing the name Sealed Air, is the same entity which prior to the 1998 transaction, was known as W.R. Grace & Co. This 1998 transaction is the heart of the subject litigation.

The significant issue in the 1998 transaction was whether Sealed Air, by merging with Grace, would be exposed to liability arising out of the asbestos lawsuits associated with Grace's chemical businesses. This issue turns on whether Grace would be solvent after the acquisition, because if insolvent, then the 1998 transaction would be deemed a fraudulent transfer, rendering Sealed Air liable.

In a joint proxy statement issued in connection with the 1998 transaction, Grace and Sealed Air acknowledged the potential for fraudulent transfer claims by creditors, but reassured investors that no fraudulent transfer occurred. Additionally, Sealed Air and Grace stated that based on available information from their legal, financial, and other advisors, Sealed Air and Grace believed that they would be able to satisfy all liabilities as they became due.

2

In an effort to prove Grace's solvency and avoid fraudulent transfer liability, Sealed Air would need to demonstrate that the spin-off's assets exceeded its liabilities including the asbestos liabilities. In March 1997, Sealed Air's counsel retained KPMG Peat Marwick LLP ("KPMG") to estimate costs of currently pending and future bodily injury claims related to Sealed Air's production of insulating material containing asbestos. KPMG prepared a report of the solvency analysis, not publicly disclosed, which projected Sealed Air's expected future asbestos claim liability.

The parties dispute whether KPMG's report was conclusive. Sealed Air failed to disclose to KPMG that it had suppressed asbestos claims at the time of the 1998 transaction. Additionally, the report failed to take into account the asbestos liabilities arising from contamination from mining operations at Libby, Montana; those liabilities have resulted in indictments and pending criminal proceedings against Grace officials.

In 2001, Grace filed for bankruptcy due to an increasing number of asbestos related bodily injury claims. In the Grace bankruptcy proceedings, Sealed Air was sued by the asbestos claimants' creditors' committee. The basis of that lawsuit was a claim that the 1998 transaction constituted a fraudulent transfer. The complaint in the fraudulent transfer proceeding was filed in March 2002, and the case was numbered Adversary Proceeding 02-02210.

On July 29, 2002, United States District Judge Wolin issued an opinion in the Adversary Proceeding. That ruling concerned a pre-trial *in limine* determination of the choice of law and legal standards to be applied at the upcoming trial to determine Grace's solvency. This ruling eased the burden of proof for asbestos plaintiffs to prove that the transfer was fraudulent and designed to shield Grace's assets from asbestos claims. Judge Wolin ruled that Grace was aware that at the time of the 1998 transaction, Grace faced growing asbestos liabilities and therefore was insolvent when Sealed Air acquired it. This disclosure resulted in a two-day, 60% decline in the price of Sealed Air stock. Sealed Air was charged $850,000,000 to reflect settlement of the fraudulent transfers. However, prior to this announcement, Sealed Air

3

> denied that it could be liable for a fraudulent transfer in order
> to inflate Sealed Air's stock price.

(Opinion dated March 13, 2008, at 1-4) (citations omitted).

The present discovery motion focuses on Defendants' refusal to produce documents they claim are privileged.  Plaintiff has requested four categories of documents: "(1) all transactional due diligence documents related to Sealed Air's analysis of Grace's solvency and asbestos and environmental liabilities; (2) all documents transmitted between Wachtell, Lipton, Rosen & Katz (Grace's corporate counsel) [("Wachtell")] and/or Grace on the one hand, and Sealed Air and/or Sealed Air's corporate counsel, Davis Polk & Wardwell [("Davis Polk")] on the other hand, prior to the filing of first successor liability suit against Sealed Air, entitled Priest v. W.R. Grace & Co.-Conn; (3) all documents transmitted between Donaldson, Lufkin & Jenrette on the one hand, and Sealed Air and/or Sealed Air's counsel, Davis Polk & Wardwell on the other hand; and (4) documents transmitted to various third parties."  (Pl.'s Br. 1.)  The crux of the motion is the applicability and/or waiver of the attorney-client privilege and work-product doctrine.  Plaintiff has not identified the specific documents it seeks by reference to entries on Defendants' extensive privilege logs.  Rather, Plaintiff asks this Court to accept certain legal principles, which if done presumably will result in disclosure of the documents it seeks.

Defendants object to this approach.  They contend that Plaintiff must identify the specific documents in dispute and that the failure to do so should itself serve as a basis for the denial of the motion.  Noting that their privilege logs amount to upward of 600 pages and 8,000 documents, Defendants contend they cannot adequately address the motion in the manner it has been presented.[1]

---

[1] There is authority for Defendants' position.  E.g., Metric Conductors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd., No. 97-369, 1998 WL 1742589, at *4 (E.D.N.C. Sept. 28, 1998) ("[T]his

Putting that aside, they have responded, to the extent possible, on the merits of each of the legal propositions.

Given the quantity of documents involved and the fact that the parties have argued purely legal issues with respect to categories of documents, the Court concludes that it is appropriate to decide the motion as presented.  It is expected that the parties will confer as to the production of specific documents based on the categorical decisions herein.

## **DISCUSSION**

### A.    **General Standard:  Attorney Client Privilege**[2]

The purpose of the attorney-client privilege is to "encourage full and frank communications between attorneys and their clients."  Upjohn Co. v. United States, 449 U.S. 383, 389 (1981).  The privilege is founded upon "the necessity, in the interests and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or apprehension of disclosure."  Hunt v. Blackburn, 128 U.S. 464, 470 (1888).  The Third Circuit has enumerated the elements of the privilege as follows:

> The privilege applies only if (1) the asserted holder of the
> privilege is or sought to become a client; (2) the person to

court retains the discretion to determine that a party's motion to compel discovery is overly broad in scope.  Here, plaintiff seeks the disclosure of *all* documents that have been withheld on the basis of privilege and the restoration of *all* redacted passages . . . . [T]hus, to the extent plaintiff has not advanced specific challenges to defendant's claims of attorney-client and work-product privilege, plaintiff's motion to compel is denied on the basis that it is too broad and not sufficiently specific.").

[2] Because this case is based on federal question jurisdiction, the federal common law of privilege applies.  See Wm. T. Thompson v. General Nutrition Corp., Inc., 671 F.2d 100, 103 (3d Cir. 1982).

> whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (I) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

In re Grand Jury Investigation, 599 F.2d 1224, 1233 (3d Cir. 1979).

The party asserting the attorney-client privilege bears the burden to show that it applies. See In re Grand Jury Empaneled Feb. 14, 1978, 603 F.2d 469, 474 (3d Cir. 1979). While it is true that the attorney-client privilege is narrowly construed because it "obstructs the truth-finding process," Westinghouse Elec. Corp. v. Republic of the Phillipines, 951 F.2d 1414, 1423 (3d Cir. 1991), the privilege is not "disfavored." In re Teleglobe Commc'ns Corp., 493 F.3d 345, 361 n.13 (3d Cir. 2007). Courts should be cautious in their application of the privilege mindful that "it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege." Fisher v. United States, 425 U.S. 391, 403 (1976). In all instances, the facts underlying any given communication remain discoverable. See Upjohn, 449 U.S. at 395-96 ("Protection of the privilege extends only to communications not to facts. The fact is one thing and a communication concerning that fact is entirely different." (quotation omitted)).

It is axiomatic that the privilege extends to corporations. See In re Bevill, Bresler & Schulman Asset Mgmt. Corp., 805 F.2d 120, 124 (3d Cir. 1986). "As the Supreme Court has recognized, however, 'the administration of the privilege in the case of corporations presents . . . special problems.'" Id. (quoting Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 348

6

(1985)). "Communications which relate to business rather than legal matters do not fall within the protection of the privilege." Leonen v. Johns-Manville, 135 F.R.D. 94, 98 (D.N.J. 1990); see also Coleman v. Am. Broad. Co., 106 F.R.D. 201, 205 (D.D.C. 1985).  Therefore, the general rule is "while legal advice given to a client by an attorney is protected by the privilege, business advice generally is not." In re Nat'l Smelting of New Jersey, Inc. Bondholders' Litig., No. 84-3199, 1989 U.S. Dist. LEXIS 16962, at *18 (D.N.J. June 29, 1989) (citation omitted); see also Claude P. Bamberger Int'l, Inc. v. Rohm & Haas Co., No. 96-1041, 1997 WL 33768546, at *2 (D.N.J. Aug. 12, 1997) (Cavanaugh, J.) ("Business and personal advice are not protected by the privilege. . . . " (citing United States v. Davis, 636 F.2d 1028, 1044 (5th Cir. 1978))).

  While this rule seems simply stated, its application is much less so; the reason being, "in the corporate community, legal advice 'is often intimately intertwined with and difficult to distinguish from business advice.'" Leonen, 135 F.R.D. at 98-99 (quoting Sedco Int'l SA v. Cory, 683 F.2d 1201, 1205 (8th Cir. 1982)).  Because it is "often too difficult, impractical and unrealistic to compartmentalize whether certain advice given to a client is legal in nature or business in nature in the context of a complicated securities transaction," the policy behind the attorney-client privilege is "best upheld . . . where the attorney-client relationship is predominantly for the purpose of rendering legal services." In re Nat'l Smelting, 1989 U.S. Dist. LEXIS 16962, at **21-22.  Thus, the proper inquiry "is focused on whether the communication is designed to meet problems which can fairly be characterized as predominately legal." Leonen, 135 F.R.D. at 99; see Bamberger, 1997 WL 33768546, at *2 ("[W]here a communication contains both legal and business advice, the attorney-client privilege will only apply if the primary purpose of the communication was to aid in the provision of legal advice." (citation omitted)).  In order to meet this standard, and to prevent corporate

attorneys from abusing the privilege, the claimant should demonstrate "that the communication would not have been made but for the client's need for legal advice or services." <u>Leonen</u>, 135 F.R.D. at 99 (quotation omitted).

### B.    General Standard:  Work-Product Doctrine

The federal work-product doctrine is set forth in Federal Rule of Civil Procedure 26(b)(3), which provides:

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, idemnitor, insurer, or agent).  But, subject to Rule 26(b)(4), those materials may be discovered if:
> (I) they are otherwise discoverable under Rule 26(b)(1); and
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

Fed. R. Civ. P. 26(b)(3).  The doctrine itself  "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." <u>In re Cendant Corp. Sec. Litig.</u>, 343 F.3d 658, 661-62 (3d Cir. 2003) (quoting <u>United States v. Nobles</u>, 422 U.S. 225, 238 & n.11 (1975)).

The party asserting work product protection bears the burden to show the doctrine applies. <u>See</u> <u>Conoco, Ins. v. U.S. Dep't of Justice</u>, 687 F.2d 724, 730 (3d Cir. 1982).  Courts in this Circuit have adopted a "two part test for ascertaining whether the documents (or things) at issue should be protected under the [work-product doctrine]." <u>In re Gabapentin Patent Litig.</u>, 214 F.R.D. 178, 183 (D.N.J. 2003); <u>e.g.</u>, <u>Muse-Freeman v. Bhatti</u>, No. 07-3638, 2008 WL 2165147, at *1 (D.N.J. May 21, 2008); <u>Paris v. R.P. Scherer Corp.</u>, No. 02-1044, 2006 WL 1982876, at *2 (D.N.J. July 13, 2006).

8

The first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated." In re Gabapentin, 214 F.R.D. at 183. "[T]he relevant inquiry is 'whether in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'" Maertin v. Armstrong World Indus., 172 F.R.D. 143, 148 (D.N.J. 1997) (quoting Martin v. Bally's Park Place Hotel & Casino, 983 F.2d 1252, 1258 (3d Cir. 1993) (citing United States v. Rockwell Int'l, 897 F.2d 1255, 1266 (3d Cir. 1990))). Although the litigation need not be imminent, Rockwell, 897 F.2d at 1266, "there must be an identifiable specific claim of impending litigation." Maertin, 172 F.R.D. at 148 (quoting Leonen, 135 F.R.D. at 97).

The second inquiry is whether the documents were prepared "primarily for the purpose of litigation." Paris, 2006 WL 1982876, at *2. "Documents prepared for other purposes that prove useful in subsequent litigation are not attorney work-product." In re Gabapentin, 214 F.R.D. at 184. Accordingly, documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work-product doctrine. See Rockwell, 897 F.2d at 1265-66. Ultimately, "[e]ven where the reasonable anticipation of litigation is established, whether the document comes within the purview of the work-product [doctrine] still depends primarily on the reason or purpose for the documents production." In re Gabapentin, 214 F.R.D. at 184.

## C.     Documents

### 1.     All transactional due diligence documents related to Sealed Air's analysis of Grace's solvency and asbestos and environmental liabilities

In this category, Plaintiff seeks production of documents described as: "reflecting legal analysis of quantification of Grace Liabilities"; "reflecting legal analysis of potential claims against

Sealed Air for asbestos-related liability"; and "reflecting legal analysis of potential claims against Sealed Air for fraudulent conveyance." (Pl.'s Br. 7.)

Plaintiff sets forth a number of arguments. First, it contends that the attorney-client privilege does not apply to any due diligence documents reflecting Grace's solvency because Plaintiff claims that such documents served primarily a business function. Plaintiff argues that Sealed Air considered Grace's liabilities "solely to determine the desirability of the transaction to Sealed Air." (Pl.'s Br. 11.)

Defendants contend that "[a]ll the communications between Sealed Air and its legal counsel were prepared by or for Sealed Air's lawyers for the express purpose of their being able to provide legal advice to Sealed Air in connection with the Cryovac Transaction." (Defs.' Br. 8.) According to Defendants, the reason they examined and considered Grace's asbestos related liability was to determine, and obtain legal advice regarding, whether the transaction could be attacked as a fraudulent transfer, and whether potential claims could be asserted against Sealed Air under certain theories of liability, including successor liability. Defendants argue that there is *no* business reason they undertook the analysis; rather, they contend that Sealed Air "knew that the Cryovac Transaction raised the prospect that the plaintiffs-asbestos bar could likely seek to hold Sealed Air liable for Grace's asbestos-related liabilities under some theory of liability," (defs.' br. 9), and, therefore, the company sought out "legal advice on the potential for legal claims being asserted against it following the transaction." (Id.)

As a general matter, Defendants' argument is persuasive. Of course, the Court cannot determine whether any specific document would not have been created but for the need for legal advice since the documents were not referenced. See Leonen, 135 F.R.D. at 99. Nevertheless, it is

clear that the type of documents sought are of a legal nature. This is because the essence of the entire transaction is legal rather than business in nature. Almost all corporate transactions are business based. That means in most circumstances the business aspect, i.e., the growth of business and development of profit, is the engine driving the deal. In this somewhat unusual situation, the primary purpose of the transaction was to insulate an entity from multiple liability claims. Analysis of such a transaction requires a primarily legal examination. Thus, for example, post-transaction, Sealed Air would have no involvement in asbestos, and Grace's asbestos divisions would operate as an entirely separate company. As Defendants state, the sole reason for Sealed Air's interest in asbestos matters at all was its own *liability* — a fundamentally legal issue.

Sealed Air has submitted the declaration of its General Counsel, H. Katherine White. Ms. White explains that Sealed Air anticipated that claims could arise, post-transaction, with respect to conduct pre-transaction, and that Sealed Air's counsel, including in-house counsel and Davis Polk, provided advice on whether the transaction could be legally attacked as a fraudulent transfer or otherwise. (Declaration of H. Katherine White ("White Decl.") ¶¶ 4-5.)

Plaintiff does not effectively contradict the legal aspect of the transaction. It simply states that the analysis was performed to determine whether Sealed Air should engage in the transaction. Plaintiff points out that Sealed Air's in-house counsel facilitated the transmittal of documents to business people and headed certain due diligence committees. However, there is no evidence to negate the fundamental legal character of the transaction.

In transactions like this, "[l]egal advice may overlap with business advice . . . yet the advice will be privileged where it is predominantly legal." In re Nat'l Smelting, 1989 U.S. Dist. LEXIS 16962, at *21. Sealed Air clearly retained Davis Polk for purposes of obtaining legal advice. (White

Decl. ¶ 5.)  This Court is satisfied that the types of documents sought here are predominantly legal. That legal issues may present themselves, and the need for legal advice may arise, in the context of a business transaction does not make the advice sought any less legal in nature.  Sealed Air had concern regarding legal exposure.  To that end, it sought legal advice from its in-house and retained counsel.

Claude P. Bamberger Int'l, Inc. v. Rohm & Haas Co., No. 96-1041, 1997 WL 33768546 (D.N.J. Aug. 12, 1997), heavily cited by Plaintiff, is distinguishable.   In Bamberger, the document in dispute was not authored by an attorney nor did it provide legal advice.  See id. at *3.  Rather, the document was the result of an investigation into the business purposes behind the termination of a contractual relationship.  As Judge Cavanaugh noted, "the purpose behind the investigation appears to have been to search for any business improprieties."  Id.  This is diametrically different from the legal advice Sealed Air received from Davis Polk and its in–house counsel.

Moreover, to the extent Sealed Air received ancillary business advice, from in-house counsel or Davis Polk (which has been demonstrated), the privilege still holds.  Sealed Air sought legal advice, in a business context, regarding legal issues.  Even if Sealed Air received ancillary business advice, it does not follow that the communications and documents were not predominately legal. Accordingly, the Court finds that the types of documents at issue here would constitute protected attorney-client information.

Plaintiff's next argument centers on work-product.  (Pl.'s Br. 12.)  According to Plaintiff, Sealed Air cannot claim that *any* document created prior to the first successor liability suit filed in Montana state court was prepared in anticipation of litigation.  (Pl.'s Br. 13.)  The Court disagrees.

Sealed Air's pre-transaction investigation focused on potential asbestos-related claims being asserted against Sealed Air. That is what the whole deal was about. While Defendants likely hoped there would never be any future litigation, it does not follow that they did not anticipate that suits could or would be filed challenging the transaction. As a result, Sealed Air sought legal advice on anticipated, potential litigation. That litigation had not yet begun is besides the point. See In re Grand Jury, 599 F.2d at 1229 ("Indisputably, the work-product doctrine extends to material prepared or collected before litigation actually commences."). The pertinent inquiry is whether litigation was reasonably anticipated. See In re Gabapentin, 214 F.R.D. at 183. This inquiry can be satisfied well in advance of actual litigation. As the Second Circuit Court of Appeals has noted, "[i]n many instances the expected litigation is quite concrete, notwithstanding that the events giving rise to it have not yet occurred." United States v. Adlman, 68 F.3d 1495, 1501 (2d Cir. 1995). In view of the history and magnitude of asbestos litigation in this country, this Court has no doubt that Defendants reasonably anticipated litigation. In fact, that anticipation of litigation was the driving force behind the legal work that was undertaken pre-transaction. (White Decl. ¶ 5.) Thus, the Court finds that the first prong of the work-product inquiry is satisfied.

This category of documents was also likely prepared primarily for legal purposes. In fact, read closely, the section of Plaintiff's brief relating to work product does not argue that documents it seeks are anything but legal in nature. Rather, it argues that litigation, especially this case, was not anticipated. (Pl.'s Br. 12-15.) However, simply because documents were produced during the same time frame as a business transaction, it does not mean that such documents are non-legal. Davis Polk was retained to perform legal work. Sealed Air's concerns leading to Davis Polk's retention were legal in nature. The work-product performed as a result of this retention was primarily for legal

13

purposes and in anticipation of litigation.[3]  Accordingly, the Court, based on the record before it, finds

that the documents in this category are likely protected by the work-product doctrine.[4]

### 2. All documents transmitted between Wachtell and/or Grace, and Davis Polk and/or Sealed Air, prior to the filing of first successor liability suit against Sealed Air

Plaintiff seeks the production of any documents shared between Sealed Air and Grace (and/or

their respective counsel) prior to the first lawsuit against Sealed Air asserting successor liability

claims.  Plaintiff contends that because Sealed Air and Grace were on opposite ends of a business

transaction there is no privilege that applies.

Defendants counter that the documents are privileged for two reasons.  First, they contend that

they were not adverse to Grace and that disclosure of work-product protected material to a non-

adverse third party does not waive its protection.  Second (and primarily), Defendants contend that

these documents are protected by the common-interest doctrine.

---

[3] To the extent Plaintiff argues that the documents must have been produced in anticipation of *this* case, not a similar litigation, the Court disagrees.  The majority rule in this district is that work-product protection applies to documents prepared for a different case so long as the two cases are closely related in parties or subject matter.  E.g., Maertin, 172 F.R.D. at 150 n.3 ("In the case at bar, defendant . . . arguably prepared the documents in anticipation of any litigation with any of the various agencies.  Although the instant suit was brought by individual plaintiffs rather than the agencies, the litigation clearly focuses on the same subject matter . . . . Therefore, [defendant] may assert that the documents at issue are protected by the work-product doctrine even if they may have been prepared in anticipation of prior . . . litigation.").

[4] Plaintiff argues that "[t]o the extent the Court finds that a document identified in this [m]otion may be privileged, the Plaintiffs request production of the portions of those documents consisting of factual material and all non-privileged materials." (Pl.'s Br. 15.)  Apart from the fact that no documents were specifically identified in this motion, the Court agrees.  So do Defendants. (Defs.' Br. 15 n.3.)  Thus, it is unclear what, if anything, is in dispute.  To the extent there is a dispute between the parties over what constitutes factual matter, this must be presented in more detail, including reference to specific documents.

Generally, the voluntary disclosure of an attorney-client communication to a third party waives the attorney-client privilege.  See Rockwell, 897 F.2d at 1265.  The common-interest (or community-of-interest) privilege provides an exception to this rule.  Defendants bear the burden to show that the attorney-client privilege has not been waived.  See Greene, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, 202 F.R.D. 418, 423 (E.D. Pa. 2001).

The common-interest privilege "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others."  In re Teleglobe Commc'ns Corp., 493 F.3d 345, 364 (3d Cir. 2007).  It is only applicable, however, if an underlying privilege has been established.  See Andritz Sprout-Bauer, Inc. v. Beazer East, Inc., 174 F.R.D. 609, 634 (M.D. Pa. 1997).  If an underlying privilege is established, the doctrine applies in civil and criminal cases as well as purely transactional contexts.  See In re Teleglobe, 493 F.3d at 364.  As articulated by the Third Circuit, the privilege protects communications made between attorneys when all members of the community share a "common legal interest" in the shared communication.  Id.; see also Paul Rice, Attorney-Client Privilege in the United States § 4:35 (2007).  Although the most common statement of the degree of interest required is that "the interest be identical, not similar, and be legal, not solely commercial," Duplan Corp. v. Deering Milliken, Inc., 397 F. Supp. 1146, 1172 (D.S.C. 1975), the Third Circuit has not specifically adopted such a stringent approach, nor has it been endorsed by at least one commentator.  See Rice § 4:36 ("A standard of identical legal interests is unnecessarily narrow.").  Instead, the Court of Appeals has noted that "members of a community of interest must share *at least a substantially similar legal interest*."  In re Teleglobe, 493 F.3d at 365 (emphasis added); see also Andritz Sprout, 174 F.R.D. at 634 ("The interests of the parties need not be identical, any may even be adverse in some respects.").

15

Plaintiff argues that no such interest exists here because the parties were adverse during the business transaction. As support, Plaintiff highlights that Sealed Air had, pre-transaction, separate experts from Grace and that one of Grace's Senior Vice-Presidents, Gary Kaenzig, sent a memo to Grace's due diligence team prior to the transaction advising them to act in the best interests of Grace until closing. (Pl.'s Br. 18.) Conversely, Sealed Air argues that both it and Grace anticipated that asbestos claims would be brought against them simultaneously. As such, Defendants argue that Sealed Air and Grace shared a common legal interest in defending against such potential claims. (Defs.' Br. 16.)

Plaintiff's challenge to Defendants' assertion of common-interest rests primarily on the fact that the parties were on adverse sides of a business deal. This does not compel the conclusion that the parties did not share a common legal interest. In Hewlett-Packard Co. v. Bausch & Lomb, Inc., 115 F.R.D. 308 (N.D. Cal. 1987), Magistrate Judge Wayne D. Brazil found that the defendant and a prospective buyer of one of the defendant's subdivisions had sufficiently common interests to permit the defendant's sharing of a patent opinion letter with the prospective buyer. Id. at 312. Judge Brazil found that the privilege was properly sustained, in part, because the defendant and prospective purchaser faced the possibility of joint litigation in which they would share a common interest. See id. at 310. This conclusion was reached despite the fact that the transaction was not ultimately consummated. See id. The same reasoning applies here.

Plaintiff's argument, that "Grace and Sealed Air were on the opposite sides of a deal and there can be no such privilege that applies in these circumstances," is simply too broad. See Hewlett-Packard, 115 F.R.D. at 310. "The weight of case law suggests that, as a general matter, privileged information exchanged during a merger between two unaffiliated business would fall within the

common-interest doctrine." <u>Cavallaro v. United States</u>, 153 F. Supp. 2d 52, 61 (D. Mass. 2001), <u>aff'd on other grounds</u> 284 F.3d 236 (1st Cir. 2002); <u>see also</u> <u>Rayman v. Am. Charter Fed. Sav. & Loan Ass'n</u>, 148 F.R.D. 647, 655 (D. Neb. 1993) (finding common interest doctrine applicable to communications between potential merger partners).[5]  Sealed Air has shown that it had a sufficient common legal interest with Grace prior to the filing of the first successor liability suit.  Prior to the transaction, both Grace and Sealed Air anticipated potential litigation related to asbestos issues.  They also retained a substantially similar legal interest in defending against such claims.  Plaintiff contends that there was not an *identical* legal strategy, but that is beside the point.  All of the participants interests "need not coincide."  Rice § 4:36.  Defendant has established that pre-transaction they anticipated the same claims and shared a common-interest in defending against those claims.  Thus, Defendants have established that the common-interest privilege precludes the discovery sought.

Apart from the common-interest privilege, Defendants' claim of work-product protection also precludes at least some of the discovery sought.  Waiver of work-product protection occurs only when a disclosure enables an adversary to gain access to the information.  <u>See</u> <u>Westinghouse</u>, 951 F.2d at 1428; <u>Maldonado v. New Jersey</u>, 225 F.R.D. 120, 131 (D.N.J. 2004) ("The essential question with respect to waiver of the work-product [doctrine] by disclosure is whether the material has been kept

---

[5] The Court acknowledges that certain courts have declined to adopt all of the policy rationales underlying <u>Hewlett</u>.  <u>E.g.</u>, <u>Oak Indus. v. Zenith Indus.</u>, No. 86-4302, 1988 WL 79614, at *4 (N.D. Ill. July 27, 1988).  However, this Court does not reach this issue because Plaintiff has simply claimed that parties on opposite ends of a business transaction cannot sustain a privilege—that is, they argue there is no common legal interest.  Moreover, in most instances, the courts that do not follow Judge Brazil's reasoning generally decide that the parties to the transaction had no "common legal interest."  <u>E.g.</u>, <u>Nidec v. Victor Co. of Japan</u>, 249 F.R.D. 575, 579 (N.D. Cal. 2007) ("In the instant case, there appears little to indicate that [d]efendants and the TPG fund might ever engage in joint litigation. The TPG fund was simply considering buying a majority share of JVC. It will not likely become a joint defendant with JVC.").

away from adversaries.").  The burden of establishing waiver of the work-product doctrine falls,

unlike the attorney-client privilege, on the party seeking to establish waiver.  See Maldonado, 225

F.R.D. at 132.

Plaintiff barely acknowledges its burden and certainly does not meet it.  It has not established

that Grace and Sealed Air were adversaries.  It has also failed to show that disclosure of protected

materials from Sealed Air to Grace increases the possibility that a truly adverse party would gain

access to such information.

In sum, Defendants have established that communications between Grace and Sealed Air are

protected from disclosure by the common-interest doctrine.  Plaintiff has not established that work-

product communications with Grace have been waived.  Accordingly, Plaintiff's request to compel

this category of information is denied.

### 3.  All documents transmitted between Donaldson, Lufkin & Jenrette on the one hand, and Sealed Air and/or Sealed Air's counsel, Davis Polk on the other hand

Plaintiff next seeks the production of all documents Sealed Air shared with its investment

bankers, Donaldson Lufkin & Jenrette ("DLJ").  (Pl.'s Br. 19.)  Plaintiff contends that Defendants

hired DLJ to provide an opinion on the fairness of the transaction.  Plaintiff further contends that DLJ

fails to qualify as Sealed Air's agent.

Defendants argue that DLJ's analyses were necessary to enable their counsel to render

effective legal advice concerning the consequences of the transaction.  Although they do not

specifically say so, Defendants imply that DLJ was Sealed Air's agent.

Although voluntary disclosure of attorney-client communications to a third-party ordinarily

waives the privilege, the privilege will not be waived if the disclosure was to an agent "whose

18

services are necessary for effective representation of the client's interests." Cellco P'ship v. Certain Underwriters at Lloyd's London, No. 05-3158, 2006 WL 1320067, at *2 (D.N.J. May 12, 2006). Stated another way:

> It has never been questioned that the privilege protects communications to the *attorney's clerks* and his other agents (including stenographers) for rendering his services. The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or by the client himself, the privilege must include all the persons who act as the attorney's agents.

8 Wigmore on Evidence § 2301, at 583 (McNaughton rev. ed. 1961) (emphasis in original). The party claiming a third-party as an agent bears the burden to show the privilege has not been waived. See Cellco, 2006 WL 1320067, at *2 (quotation omitted).

The concept of the attorney-client privilege extending to third-party agents has been developed through case law and has included "investigators, interviewers, technical experts, accountants, physicians, patent agents, and other specialists in a variety of social and physical sciences." Rice § 3:3; 1 Edna Selan Epstein, The Attorney-Client Privilege and the Work Product Doctrine 219 (5th ed. 2007) ("Epstein"). Much of this case law derives from what has been referred to as the "Kovel doctrine," named after the Second Circuit Court of Appeals case, United States v. Kovel, 296 F.2d 918 (2d Cir. 1961). Epstein at 217.

In Kovel, the Second Circuit Court of Appeals held that the attorney-client privilege extends to an accountant hired to assist the attorney in understanding the client's information. Id. at 922. The court analogized an accountant to a translator and found that "the presence of an accountant, while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . . ." Id. On the facts of the case before it, the court found that "the presence of the accountant is necessary,

19

or at least highly useful, for the effective consultation between the client and the lawyer which the privilege is designed to permit." Id. The Second Circuit emphasized that in all instances the facts communicated to the agent must have been in confidence and for the purposes of obtaining legal advice. See id. ("If what is sought is not legal advice but only accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists.").

In United States v. Ackert, 169 F.3d 136 (2d Cir. 1999), the Second Circuit was again presented with a request for a derivative extension of the attorney-client privilege, this time to a third-party investment banker. In Ackert, the court refused to extend the attorney-client privilege to protect communications between Paramount and a third-party investment banker from Goldman Sachs. The Second Circuit found that counsel was not "relying on [the investment banker] to translate or interpret information given to [the lawyer] by his client. Rather, [the lawyer] sought out [the investment banker] for information it did not have about the proposed transaction and its tax consequences." Id. at 139-40. Because the investment banker's role "was not as a translator or interpreter of client communications," the documents were not protected from disclosure. Id. at 140.

The Court discerns two principles from Ackert, Kovel, and their progeny. First, the third party's involvement must be necessary to the lawyer's provision of legal advice. See Cavallaro v. United States, 284 F.3d 236, 247-49 (1st Cir. 2002); cf. United States v. Antolini, 271 Fed. App'x 268, 271 n.1 (3d Cir. 2008); United States v. Alvarez, 519 F.2d 1036, 1045 (3d Cir. 1975). That means that the agent must "evaluate the information and in a sense 'translate' it into understandable terms for the non-expert attorney." Epstein at 219; see Cavallaro, 284 F.3d at 247-48; In re G-I Holdings, 218 F.R.D. 428, 436 (D.N.J. 2003) (tax expert must facilitate communications between attorney and client to qualify as an agent); Black & Decker Corp. v. United States, 219 F.R.D. 87, 90

(D. Md. 2003) (agent must "facilitate communications between [the litigant] and their attorneys.");

United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1072 (N.D. Cal. 2002).  Second,

communications between an attorney and a third-party are not protected from disclosure simply

because the communications later become beneficial to the representation of the client.  See Cellco,

2006 WL 1320067, at **3-4; Urban Box Office v. Interfase Managers, L.P., No. 01-8854, 2006 WL

1004472, at *4 (S.D.N.Y. Apr. 17, 2006) ("However, simply because financial consultants are

employed to assist a company in a restructuring transaction does not mean that their communications

with the company's attorney's are privileged."); Export-Import Bank of the United States v. Asia Pulp

& Paper Co., 232 F.R.D. 103, 113 (S.D.N.Y. 2005); In re G-I Holdings, 218 F.R.D. at 436.  Applying

these principles to the case *sub judice*, the Court finds that Defendants have not met their burden of

establishing that DLJ was acting as Sealed Air's agent for purposes of the attorney-client privilege.

Defendants contend that DLJ's analyses were essential to enable Sealed Air's counsel to

render effective legal advice.  They cite to Ms. White's declaration, at paragraph eight, as support for

their assertion that DLJ's analyses were essential to the provision of legal advice.  Paragraph eight

states: "I also understand that Davis Polk performed its analysis of Grace's asbestos-related liabilities

with the assistance of DLJ, which provided expertise concerning financial modeling and forecasting."

(White Decl. ¶ 8.)  Plaintiff has attached to its moving papers DJL's retainer letter.  The retainer

agreement is dated August 5, 1997.  It is on DLJ letterhead and addressed to Sealed Air Corporation

and T.J. Dermot Dunphy.  In pertinent part it provides:

> This letter agreement (the "Agreement") confirms our
> understanding that Sealed Air Corporation (which together
> with its subsidiaries and affiliates is hereinafter referred to as
> the "Company") has engaged Donaldson, Lufkin & Jenrette
> to act as its exclusive financial advisor for a period of 12
> months   commencing   upon   your   acceptance   of   this

Agreement, with respect to the possible acquisition by the Company or its affiliates of the Cryovac Division of W.R. Grace & Co. ("Target"), in one or a series of transactions, by merger, consolidation, or any other business combination, by purchase involving all or a substantial amount of the business, securities or assets of the Target, or otherwise (each a "Transaction").

As discussed, we propose to undertake certain services on your behalf including, to the extent requested by you: (I) assisting you in evaluating the Target, its operations, its historical performance and its future prospects; (ii) advising on a proposed purchase price and form of consideration; (iii) assisting you in structuring the Transaction; and (iv) negotiating the financial aspects of any Transaction under your guidance. If requested we will deliver our opinion to the Board of Directors of the Company as to the fairness to the Company's stockholders from a financial point of view of the consideration to be paid by the Company in a Transaction, and we will update our opinion from time to time as requested by Company.

. . . .

The Company acknowledges and agrees that DLJ has been retained solely to provide the advice or services set forth in this Agreement. DLJ shall act as an independent contractor, and any duties of DLJ arising out its engagement hereunder shall be owed solely to the Company.

(Retainer Agreement, attached to the Declaration of Leigh Handelman Smollar ("Smollar Decl.") as

Ex. E.)[6]

---

[6] It is unclear whether the "Sealed Air Corporation" that entered into this agreement is the the same "Sealed Air" named as a defendant in this case. Stated differently, the defendant in this case bearing the name "Sealed Air" was W.R. Grace & Co. prior to the transaction. (Compl. ¶¶ 2-3, 50, 52.) Thus, the defendant in this case could arguably be described as the "target" in the retainer agreement, not the company that retained DLJ. The parties have not addressed this point or the Supreme Court's holding in Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the attorney client privilege passes as well."). As such, this issue plays no role in the Court's decision.

The retainer agreement contains no mention of legal advice or Defendants' attorneys.  It also makes no representation that information provided to it would be shared with Defendants' counsel.  This is indicative of the non-legal nature of DLJ's retention.  As one commentator has noted:

> Another important step is that the attorney should document the relationship with the accountant or other business expert using a written engagement agreement that precisely defines the terms of any arrangement.  *The engagement agreement should also set forth the legal purpose of the . . . services.*  If appropriate, the engagement agreement should state that the accountant is being hired in anticipation of litigation.  It may also be worthwhile for the attorney to state in the retainer agreement the likelihood of hiring one or more consultants as experts.
>
> *The engagement agreement should expressly state that all communications among the attorney, client, and accountant are incidental to the rendering of legal services and are intended to be confidential.*

Carl Pacini, Pamella Seay & Raymond Placid, <u>Accountants, Attorney-Client Privilege, and the Kovel Rule: Waiver Through Inadvertent Disclosure Via Electronic Communication</u>, 28 Del. J. Corp. L. 893, 925-26 (2003) (emphasis added).

Here, if DLJ was truly retained to assist Defendants' attorneys in the provision of legal advice, there would likely be at least a mention of legal advice or counsel in the retainer agreement.  There are none.  There is no mention of legal services at all.  The retainer agreement specifically details the four obligations that DLJ would undertake (quoted above) and none involve legal advice.  Furthermore, there is no mention of providing materials or information to Defendants' counsel.  To the contrary, the retainer agreement provides that DLJ will not disclose materials it receives to "*anyone* other than DLJ's agents and advisors without the Company's prior approval."  (Smollar

Decl. Ex. E at 2.)  The text of the retainer agreement confirms that DLJ's retention was for business and financial purposes.

In addition, the declarations Defendants have submitted in connection with this motion do not explain how DLJ was to "translate" information into terms that counsel could use more effectively. In order to extend attorney-client protection on the present facts, the Court would have to ignore that "[t]he involvement of the third party must be nearly indispensable or serve some specialized purpose in *facilitating attorney-client communications*."  Cavallaro, 284 F.3d at 249 (emphasis added). Defendants have not shown that DLJ's retention was to facilitate legal advice from its attorneys at all; rather, the retainer agreement clearly shows that DLJ's retention was for its financial purposes. The retainer agreement contemplates an evaluation of another company and the structuring of the *financial* aspects of a transaction.  That DLJ's financial underwriting advice may have touched on certain legal issues is besides the point.  As the court in Black & Decker noted:

> [The accounting firm] was providing hybrid advice to plaintiff-tax and business advice which by its nature, had a legal component.  Given the complexity of the transactions at issue, it is understandable why plaintiff wanted to, and did, retain the services of [the accounting firm] to help evaluate the tax and business implications of the transaction.  The record does not support the conclusion that [the accounting firm's] advice – or the documents at issue – were provided primarily to assist the plaintiff's
> attorney in rendering legal advice.

Id. at 91.

Finally, that Defendants' counsel may have found DLJ's analyses useful in providing legal advice is irrelevant if the purpose of DLJ's retention was not legal in nature.  See Kovel, 296 F.2d at 922 ("If what is sought is not legal advice . . . or if the advice sought is the [third-party's] rather than

24

the lawyer's, no privilege exists."); Cellco, 2006 WL 1320067, at *4.  Because the Court finds that DLJ was not retained to facilitate the attorney-client relationship, the information is not protected under the Kovel doctrine.  As such, Defendants have waived the attorney-client privilege as it relates to documents distributed to DLJ.

This is a very limited holding, however.  Defendants note that they have also claimed work-product protection over a number of these documents.  (See Defs.' Br. 20 n.5.)  As has already been noted, waiver of work-product protection occurs only when a disclosure enables an adversary to gain access to the information.  See Westinghouse, 951 F.2d at 1428.  The burden of establishing waiver is Plaintiff's.  See Maldonado, 225 F.R.D. at 132.  Plaintiff does not argue that DLJ is adverse to Defendants in any way.  As such, documents involving DLJ over which Defendants claim work-product protection remain shielded from disclosure.

### 4.    Documents transmitted to various other third parties

In the final category of documents, Plaintiff's seek the production, it appears, of documents transmitted between the Securities Exchange Commission and Sealed Air.  Plaintiff's argument on this point consists of two sentences, without citation to any law, and does not reference a single document.  (Pl.'s Br. 19.)

Defendant responds by speculating that Plaintiff seeks the production of three documents appearing on its privilege logs as drafts of communications from Ms. White to the SEC.  Defendant contends these documents reflect legal advice and are privileged.

The Court cannot resolve this matter on the information presented.  First, the law regarding the privileged nature of draft documents is not entirely clear.  Compare Schenet v. Anderson, 678 F. Supp. 1280, 1284 (E.D. Mich. 1988) ("The privilege is waived only as to those portions of the

preliminary drafts ultimately revealed to third-parties."), and Holland v. Island Creek Corp., 885 F. Supp. 4, 8 (D.D.C. 1995), with In re Grand Jury Proceedings, Thursday Special Grand Jury Term, 1991, 33 F.3d 342, 353 (4th Cir. 1994) (finding information communicated with attorneys for use in public filings with the SEC not protected and rejecting Schenet); also cf. United States v. Moscony, 927 F.2d 742, 752 (3d Cir. 1991) ("It is generally true that if the client intended the matter to be made public, the requisite confidentiality is lacking.  For example, information communicated by a client which he knew would be disclosed in legal documents . . . is outside the privilege.").  This Court cannot rule on this category of documents  without a more focused presentation of the applicable law and the specific documents sought.  It is unclear precisely what documents are being sought and on what basis.  As such, Plaintiff's request to compel documents falling within category four will be denied without prejudice.

## CONCLUSION

For all of the above stated reasons, Plaintiff's motion to compel is **granted in part and denied in part**.  More specifically,

- Plaintiff's request to compel all transactional due diligence documents is **denied**;

- Plaintiff's request to compel communications between Sealed Air and/or its counsel and Grace and/or its counsel is **denied**;

- Plaintiff's request to compel communications between Donaldson, Lufkin & Jenrette and Sealed Air and/or Sealed Air's counsel is **granted** to the extent documents have been withheld on the basis of the attorney-client privilege only.  Plaintiff's request is **denied** to the extent Defendants' have asserted work-product protection over certain of these documents;

- Plaintiff's request to compel documents transmitted to third-parties is **denied without prejudice**.

An appropriate Order accompanies this Opinion.

Dated: August 11, 2008

       s/Mark Falk
      **MARK FALK**
      **United States Magistrate Judge**

Orig.:  Clerk of the Court
cc:    Hon. Dennis M. Cavanaugh, U.S.D.J.
      All Parties
      File